We'll hear argument this morning in Case 13-298, Alice Corporation v. CLS Bank International. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. It is common ground between the parties in this case that Section 101, by its terms and with the sweeping interpretation this Court adopted in Bilski, applies directly to the patents here. These are system and process patents that speak directly to Section 101. And the only issue, then, is whether the judicially recognized exception that this Court adopted many, many years ago applies under these circumstances. Just repeat what you said. It is common ground between the parties that our patents speak directly to the language of Section 101, that is, they are process and they are machines, and they are improvements to the process and the machines. They don't dispute that by its terms 101 applies. The only argument between the parties is the abstract idea exception that exists and whether that bars us from otherwise satisfying Section 101. Mr. Phillips, on the abstract idea, you know that the Bilski case held that hedging qualified as an abstract idea. So how is intermediate settlement a less abstract than hedging? If our patent merely claimed intermediate settlements, all I have to say, I don't really know exactly what that means, because I don't think that's the same kind of economics, basic economics concept that hedge risk treatment is. But if it claimed that, we wouldn't have a distinction from Bilski. What we claim is a very specific way of dealing with a problem that came into being in the in these very massive multi-party problems in which you need to deal with difficulties that exist in different time zones simultaneously and to do it with a computer so that you not only take them on chronologically, deal with them sequentially based on the kind of software analysis that the patent specifically describes by function, and goes even further than that and does something that no escrow agent and no intermediated settler that I know of, it actually blocks specific transactions that in the shadow account would violate the terms of the settlement. Well, let me put it this way. If you describe that to a second-year college class in engineering and said here's my idea, now you go home and you program over this weekend, my guess is, my guess is that that would be fairly easy to program. So the fact that the computer is involved, it seems to me it's necessary to make it work, but the innovative aspect is certainly not in the creation of the program to make that work. All you're talking about is, if I can use the word, an idea. I prefer not to use that word for obvious reasons. But if you look at the solicitor's view or a method or a process. Right. And obviously methods and processes are precisely what section 101 permits. Why is that less abstract? I'm sorry? Why is that less abstract? I mean, imagine King Tut sitting in front of the pyramid where all his gold is stored, and he has the habit of giving chits away, good for the gold, which is given at the end of the day, and he hires a man with an abacus. And when the abacus keeping track sees that he's given away more gold than he has in the pyramid, he says, stop. You see? Or my mother, who used to look at my checkbook, when she saw that, in fact, I'd written more checks than I had in the account, she would grab it. Stop. You see, so what is it here that's less abstract that the computer says, stop? How is that less abstract than King Tut? If we had the same thing with a grain elevator, if we had the same thing with a reservoir of water, if we had the same thing with my checkbook, you see the point? I do see the point, Justice Breyer, and it seems to me it goes to the question of the methodology you're going to employ. The methodology is, as you said, stop. So what we have different here is the computer stops, rather than the abacus man stopping, or my mother stopping, or the guy that the grain elevator has that says stop. So, just saying, is that it? In other words, if you say, computer stop, you have an invention, useful, but if you say, mother stop, you don't. No, well, again, it seems to me that in some ways what you describe there is a caricature of what this is. Of course it's a caricature. It's a caricature designed to suggest that there is an abstract idea here. It's called solvency. And what you do is you take the idea of solvency and you say, apply it. And you say, apply it through the computer. Is that enough to make it not just the abstract idea? And now we're at the heart of why I used my exaggerated examples. Because you will tell me why this is enough. Right. Because, Justice Breyer, the concept here is not simply to say stop. Stop is obviously part of the element of it. But it's also designed to ensure that at the end of the day, this transaction in the midst of literally a global set of deals that are going on simultaneously will be implemented at the appropriate time in the appropriate way. And whatever else that may be, it seems to me it's difficult to say that's an abstract idea as implemented. Sotomayor, but what it appears to be, it sounds like you're trying to revive the patenting of a function. You used the word function earlier, and that's all I'm seeing in this patent is the function of reconciling accounts, the function of making sure they're paid on time. But in what particular way, other than saying do it through a computer, is this something new and not function? It does it through the shadow accounts because of the concerns for security. You're not going to allow somebody to enter into a central bank's own accounts. You create the shadow accounts. You monitor through the software that allows you to do that. You evaluate each of the transactions to ensure that the settlement will be available. You do it sequentially, and you act on it by the end of the day or whenever the transaction is to take place, and you implement that transaction. Why isn't doing it through a computer not enough? I mean, was the cotton gin not an invention? Because it just means you're doing through a machine what people used to do by hand. It's not an invention. It's the same old, same old. Why is a computer any different in that respect? At one level, I agree with you completely. There is no difference between them. This Court has, however, said on more than a few occasions, albeit in dicta, that coming up with an idea and then say use a computer is not sufficient. And what I'm trying to suggest to you is we don't fall within that dicta. Now, if you don't accept the dicta and you say use a computer is fine, then I think we're done. Scalia. I don't think saying use a computer is much of a novelty. I mean, that's — that goes to whether it's novel or not. If you just say use a computer, you haven't invented anything. But if you come up with a serious program that does it, then, you know, that may be novel. But that's a novelty issue, isn't it? To be sure, Justice Scalia, and that is exactly the question. I really would like you to focus on, for me, why is it, and I'm not saying this from a point of view, but it seems to me pretty clear that if what you did was take the idea of solvency, remember King Tut, that's why I use the exaggeration, and what you say is implement it by having the abacus man keep track and say stop, okay? Then we implement it by having somebody with a pencil and a piece of paper. And this is all that they add, you see. You say have a man with a pencil and a piece of paper keeping track and saying stop. Or we say implement it in the computer, which will automatically keep track and say stop. Are they all enough? Are some of them enough? What's the rule? And you realize I couldn't figure out much in Prometheus to go beyond what I thought was an obvious case, leaving it up to you and your colleagues to figure out how to go further. Am I making enough? It's clear enough what's bothering me, and I'd really like to get your answer. And, look, there's no — I'll be the first one to confess that, you know, trying to use language to describe these things is not all that easy. But the way I think you can meaningfully look at this is to say that this is not simply something that was a fundamental truth. This is not something that simply says use a computer. It's not simply something that says maintain solvency. It operates in a much more specific and concrete environment, where you're dealing with a problem that's in existence since the 1970s, a solution in the 1990s that CLS itself acknowledges needed a solution and came forward with their own solution that looks a lot like ours. My initial question, and I think I can work this into King Tut, is whether or not you could have patented that system idea process method without attaching a computer program. You cannot, absolutely cannot do that with this system because it is so complex and so many interrelated parts. Kennedy, suppose I thought, and again, it's just a thought because I don't have the expertise, that any computer group of people sitting around a coffee shop in Silicon Valley could do this over a weekend. Suppose I thought that. You mean wrote the code? Yes. Right. Well, I'm — that's absolutely — I'm certain that's true. Well, then — But that's true of almost all software. Then why is the computer program necessary to make the patent valid? Well, it's necessary to make the invention effective. As the Solicitor General said, the computer is essential to the efficacy of this invention because of the complicated financial arrangements that exist and that can only be resolved on a real-time basis. Your abacus is great if you happen to be waiting for the pyramids to be finished or waiting for the gold to move in and out, but it doesn't help you with an abacus if you're dealing with literally thousands of transactions simultaneously going on in different countries at different points in time. But that's just an idea. Hey, let's use a computer. But it's not just — I mean, obviously, part of it is use the computer, Justice Kennedy, but more — it goes beyond that. See, I don't — Is your software copyrighted? No. I don't believe so. There is no special software that comes with this — that's part of this patent, is it? Is there? Right. No, Justice Ginsburg, what we did here is what the Patent and Trademark Office encourages us to do and encourages all software patent writers to do, which is to identify the functions that you want to be provided for with the software and leave it then to the software writers, who I gather are, you know, quite capable of converting these functions into very specific code. Mr. Phillips, could you disaggregate your argument for me? Because you just said — look, this Court has said it's not sufficient if you have an idea and then you say use a computer to implement it, right? So are you saying that your — are you saying that you're doing more than saying use a computer to implement it, or are you saying that it's — that the idea itself is more than an idea? I'm saying I should — Which part of what — I'm saying both, actually. I mean, I'm making both of those arguments. I believe that if you analyze the claims and you don't caricature them and you don't strip them out of the limitations that are embedded in there, this is not some kind of an abstract concept. This is not some kind — it's not an abstract idea. It's a very — So putting the computer stuff aside completely, you're saying that you've invented something or you — there is something that you've patented that has — that is not just simple use a third party to do a settlement. Right. And what is that, putting the computer aside? It is — well, and again, it's difficult to do that because you absolutely need the computer in order to implement this. But the key to the invention is the notion of being able simultaneously, dealing with it on a chronological basis, to stop transactions that will otherwise interfere with the ability to settle on time under the appropriate circumstances. And the only way you can do that in a real-time basis when you're dealing with a global economy is to use a computer. It is necessary to the efficacy of this. So in that sense, I can't — I can't disaggregate it the way in some sense you're suggesting. It seems to me it's bound up with — it's bound up with the whole notion of is this an abstract concept? It's not — Now, this is — look, there are 42 briefs in this case. I actually read them, and I found them very, very helpful up to the point where I have to make a decision, because they're — they're serious. I mean, you know, they're — now, the problem that I came away with is the one that you're beginning to discuss, that if you simply say, take an idea that's abstract and implement it on a computer, there are — you're going to get it much faster, you're going to be able to do many, many things, and if that's good enough, there is a risk that you will take business in the United States or large segments, and instead of having competition on price, service, and better production methods, will have competition on who has the best patent lawyer. You see where I'm going on that one? Yeah, of course. And if you go the other way and say never, then what you do is you rule out real inventions with computers. And so in those 42 briefs, there are a number of suggestions as to how to go between Scilla and Charybdis. Now, I would like to know — I don't know if you can step back from your representational model. That's a problem that you're all we have now. And from my point of view, I need to know what, in your opinion, is the best way of sailing between these two serious harms. Well, Justice Breyer, I guess I would suggest to you that you might want to deal with the problem you know as opposed to the problems you don't know at this stage. I mean, we have had business method patents and software patents in existence for well over a decade, and they're obviously quite significant in number. And we know what the system is we have. And Congress looked at that system, right, and didn't say no to business methods patents, didn't say no to software patents. Instead said the solution to this problem is to get it out of the judicial process and create an administrative process, but leave the substantive standards intact. So my suggestion to you would be follow that same advice, a liberal interpretation of 101 and not a caricature of the claims. Analyze the claims as written, and therefore say that the solution is 102 and 103 and use the administrative process. If you could just stop you there, because four justices of this Court did not read that legislative history the way you do, and it was, was it Bilski? Justice Stevens went carefully through that, and he said, Chalmers was reacting to a decision. It had, it was not addressing 101. So there are at least four justices who say, who didn't buy that argument. Well, I mean, it still seems to me that the natural inference is Congress did not change 101. Congress created an entire administrative system to deal with 101, 102, and 103. And I, and I'm sure that's not five anyway, right?  You've exhausted my math skills, Your Honor. By the way, we have said that you can't take an abstract idea and then say use a computer to implement it. But we haven't said that you can't take an abstract idea and then say here is how you use a computer to implement it, which is basically what you're doing. And that's a little different. And that's the argument we're making, and that's the line we're asking the Court to draw here. Well, how are you saying the how? Because I thought that your computers, that your patents really did just say do this on a computer, as opposed to saying anything substantive about how to do it on a computer. I would urge the Court to look at Joint Appendix 159, 285, 286, where it goes through the flow charts. This is, and this is just a specific example of the method by which you stop a transaction. And it goes through a very series of detailed steps and what the computer has to do in order to do that. It doesn't actually, obviously, put in the code, but that's what the PTO says don't do. Don't put in the code, because nobody understands code. So, but put in the functions, and we know that someone skilled in the art will be able to put in the code. And if they aren't, if they can't do that, then it's not enabled and that's a 112 problem. To go back, Justice Breyer, to your question. So on the one end, you've got a problem that it seems to me Congress to some extent has said is okay and we've got a solution and that solution is playing through. On the other end, if this Court were to say, much more categorically, either that there's no such thing as business method patents, or adopt the Solicitor General's interpretation, which is to say that there cannot be software unless the software somehow actually improves the computer, as opposed to software improving every other device or any other mechanism that might be out there, what we know is that this would inherently declare, and in one fell swoop, hundreds of thousands of patents invalid. And the consequences of that, it seems to me, are utterly unknowable. And before the Court goes down that path, I would think it would think long and hard about whether isn't that a judgment that Congress ought to make. I mean, it seems to me in that sense, you're essentially where the Court was in Chakrabarti, where everybody was saying you've got to act in one way or the other or the world comes to an end. And the Court just said we'll apply 101 directly. Kennedy, if we say that there's no software patentability, and I agree with the Attorney General, do you lose in this case? Well, it would be very hard for me to see how that — how I can get around that particular problem, because the computer is the essence of it, and a portion of it is clearly the software. So I think if you say there is no such thing as software patentability, I do lose in this case, yes, Your Honor. Mr. Phillips and Ms. Hodges. As do a whole lot of other people. I mean, I'll hold those positions. In response to — Is there any common ground between you and the government — maybe a better question to ask the government — a common ground between you and the government on something in the software area that's patentable, other than making the computer itself work? You understand the government to say no software patentability? That's the way I interpret the government's — the government's brief. I think there was a — it was like there's a Bloomberg brief out here that was on this. It said, no, you can — you can patent computer software when it's an improvement in the computer, when it's an improvement in software, when it's an improvement in a technology that is developed out of computers like robotics, when it is an improvement in a machine or technology, but you cannot improve it where it is simply an improvement in an activity that is engaged in primarily through mental processes. But what they mean by that is business, finance, and similar arts. That's — I mean, that's — I don't read the — So it wasn't quite what — I don't — that's what I want to know what you don't agree with about that, because it's a little more refined in your — I read the Solicitor General's brief as broader than the Bloomberg brief in terms of the approach. And if you're — and IBM's argument is if you knock out software patents, you eliminate web browsing, word processing, cell phones, e-mail. Those are all activities that I don't think fall within the meaning of the — the meaning of the government's theory of business. I think we can do it. I'm asking you, what about this one that I just mentioned? You see, I went through those five steps. Right. And four of them you could patent, and the fifth one you can't. Right. But I — and I guess my answer to that is that's nowhere in the statute, and it doesn't seem to me to reflect an abstract idea. It's — it's a — it's a line you draw that takes out business method patents. If the Court wants to eliminate business method patents, fine. But you just said no to that in Bilski two, three terms ago. Now, to be sure, give the Solicitor General credit, he comes here and says to you, we didn't like the good result in Bilski. We want you to say, don't use process in order to get there, which is a statutory interpretation. Come up with an extraordinarily complicated way of looking at the exception and use that to get to the exact same result. But you did a very good job of proving that. In Bilski, Justice Breyer did try to say that there wasn't that — a whole lot of distance between the four who thought business methods were not patentable. But he — he also said something else in the — in the other case, Mayo. Justice Scalia asked you the question about, doesn't that go to novelty? But didn't Justice Breyer say in Mayo that novelty can be relevant to patent — to patent eligibility? He said there's a — there's an overlap. Well, he said there's an overlap. Here in this context, I think that basically the Respondent's theory would mean that they are completely coterminous, and I don't think that's what the Court meant. And also, we know from Deere that there's got to be at least some significant limitations on the extent to which novelty has to be built into 101. That is the province of 102 and 103. And as I said, Congress modified the system of adjudication to create an administrative mechanism that allows you to get to 102 and 103. And it's — at least in context, it's important to realize there have been 11 cases since that was created. Nine of the 11 have been knocked out on 102 or 103 grounds and not on 101 grounds. And it seems to me that's the answer to this problem, is leave 101 as the course filter. If on its face it states these kinds of broad, abstract principles, fundamental truths, and even if it says use a computer, those should be struck down. Which of the opinions below captures your position most accurately? I would guess it would be Judge Moore's opinion below that would capture ours most correctly. Sotomayor And if we were to think your method claim is ineligible, do you agree that your systems and your medium and system claims fail as well? Do they rise and fall together? No, I don't believe they do rise and fall together. I mean, I think you could — if you wanted to interpret our medium claim — I mean, our method claims in a particularly abstract way, I think you could still say that the system claims, which clearly are how to create a computer system and how to implement it using that method, would be a much more concrete version of that in a way that would take it out of 101. That said, I obviously believe that all of our claims satisfy 101 and should go on to the next stage. Can I give you a hypothetical, Mr. Phillips, and you tell me how it's different or the same? And let's say, you know, 30 years, somebody took a look around the world and said a lot of people seem to order products by mail. They get the catalogs in the mail and then they send back their return forms. And let's say that one of the founders of the Internet said, wouldn't this be an amazing system? We could actually do this by computer. And they had patented that. Is that the same? Well, I don't know if it's the same, but I would argue that it could very well be a different order because — but it depends on how the claims play out. No, but exactly. I mean, the claim would have said something along the lines of, you know, there's this process by which people order products and we want to do it over the Internet, we want to do it electronically, and we will use a computer to do that, to essentially take the process of mail order catalogs and make it electronic. I could certainly — I think I could write a set of claims that I believe would satisfy 101. And to the extent that you think those are no different than the ones I have here, then my argument is simply I think I satisfy 101 with the claims we have before us, Your Honor. If there are no further questions, I'd like to reserve the floor. Thank you, Mr. Phillips. Mr. Perry. Mr. Chief Justice, and may it please the Court, that path between CILA and Charybdis was charted in Bilski and Mayo. Bilski holds that a fundamental economic principle is an abstract idea, and Mayo holds that running such a principle on a computer is, quote, not a patentable application of that principle. Those two propositions are sufficient to dispose of this case. If Bilski and Mayo stand, Alice's patents fail. Therefore, Mr. Phillips and his friends are asking this Court to change the standard, even though this Court has had three unanimous decisions in the last four terms, establishing what the Court called in Myriad a well-established standard. On the abstract idea, Justice Ginsburg, you asked Mr. Phillips, what's the difference between hedging and this claim? There is no difference. This is hedging. It is hedging against credit default rather than price fluctuation, but it is simply hedging. And Mr. Phillips stood up for 26 minutes and never once referred to the patent. Let's look at what the inventor, the so-called inventor, said about this invention. This is at JA 293 to 94 in the specification. This claim has simply two steps. It's very simple. First, debiting and crediting on a real-time basis the relevant shadow records. And second, by periodically effecting corresponding payment instructions. Period. Those are direct quotes. Debit, credit, and pay. Your Honor, you can't get much more simple than that. Mr. Phillips objects, well, we have multilateral transactions, global things, chronological time zones, and so forth. None of those are claimed, Your Honor. Those are all recited in the specification. The claims read on a single transaction involving two parties. Breyer, can I ask you at some point, not necessarily this second, to say, in my – this is just, you know, you have an opinion for a court, different judges can have different opinions, but I think it's pretty easy to say that Archimedes can't just go to a boat builder and say, apply my idea. All right. Everybody agrees with that. But now we try to take that word apply and give content to it. And what I suspect, in my opinion, Mayo did and Bilski and the other cases, is sketch an outer shell of the content, hoping that the experts, you and the other lawyers and the circuit court, could fill in a little better than we had done the content of that shell. So, so far, you're saying, well, this is close enough to Archimedes saying apply it, that we needn't go further. Now, will you at some point in the next few minutes give me your impression of if it were necessary to go further, what would the right words or example be? Your Honor, as Justice Breyer, as to abstract ideas, the PTO has filled in that shell by listing economic concepts, legal concepts, financial concepts, teaching concepts, dating and interpersonal relationships, and generally how business should be conducted as examples of those things that are likely abstract, which, of course, all follow directly from Bilski and the discussion this Court had in Bilski. And this patent, these patents, fall squarely within that. Congress in the AIA confirmed that reading. Congress in the CBM method said business methods that are subject to special scrutiny, that is, dubious patents, include methods and corresponding apparatus, which is what we have here, that pertain to data processing in the financial services industry and do not offer a technological solution. That describes Alice's patents to a letter, Your Honor, so that we have Congress What do you think is a technological solution? Your Honor. How could they, if at all, written their patent to make it to make their software eligible? What do they need, would have needed to have added? Justice Sotomayor, they have no software first. They have never written software. They have never programmed a computer. So that's a nonexistent set. Second, there are many technological solutions to trading and settlement problems. For example, data compression. These trading platforms involve the movement of very large quantities of data around the world. The physical pipes, that is, the fiber optic cables and data lines are limited. There are very sophisticated algorithms for both security and speed to move data through the transmission lines in novel and useful ways that could well be patented. Nothing like that is claimed here. To come back to where I started, if you look, for example, at Claim 65 of the 510 patent, as Mr. Phillips reads it, it literally reads on a two-party escrow to sell a house so long as the escrow agent is typing the stuff into the HUD-1 using a computer. That has nothing to do with multiplexing. Roberts, he referred us to Joint Appendix page 159, which is not a change in how computers work, but it is – constitutes the instructions about how to use the computer and where it needs to be affected. And just looking at it, it looks pretty complicated. There are a lot of arrows and the, you know, different things that go and – Roberts, I mean, you know, in different directions, and I understand him to say that at each of those places, that's where the computer is needed. Mr. Chief Justice, Figure 16 has nothing to do with the invention asserted against my client in this case. There are two inventions in this patent. One invention involving multilateral contract formation is not asserted against my client. And all of these drawings pertain to that. The only drawings that pertain to the asserted claims are 25 and 33 to 37. And that was established below and it's established in this Court. And Mr. Phillips has never disputed it. So the claim he's pointed the court to, the figure he's pointed the court to, has nothing to do with the invention. It's for a different invention that is not at issue in this case. Remember, there are hundreds and hundreds of pages of these patents. They all pertain to the other invention. That's why in the back of our red brief we excerpted the very little bit that actually pertains to this, you know, sort of tack-on patent, the tack-on claim Mr. Phillips is asserting here. It's four columns. It's less than five pages in the printed appendix that actually pertains to this invention. And it contains no disclosure whatsoever. Justice Scalia, to your question about how the computer does it, of course a patent that describes sufficiently how a computer does a new and useful thing, whether it's data compression or any other technological solution to a business problem, a social problem, or a technological problem, would be within the realm of the patent laws. That is what the patent laws have always been for. This is not such a patent. And the reason for that is this is a pre-Bilski set of patents. These were prosecuted under the old State Street test, where all the applicant had to claim was a result. Would you give me again, you already did once, an example of a business process patent, of a business process idea and invention that is patentable? Your Honor, there are many examples. One would be a technological solution to a business problem. So that, for example, I'll give a different example, there are many applications today, the Court may be familiar with, streaming video, to watch video on your computer. It is not possible to get enough data through existing lines in its raw format. The data has to be manipulated in order to see live video. So if you want to watch TV on your phone, for example. Those algorithms, those inventions are undoubtedly technological, and if they are used in a trading platform or a hedging system or something else, that wouldn't disable them. And this is what the Deere case is. Kennedy, in my language, I'd call that mechanical rather than process. Can you give me an example of process? Yes, Your Honor. The process in that example would be a computer running the particular data compression algorithm. That's how to make a machine work better. Yes, Your Honor. In my view, is there any business process, any business activity that is susceptible to patent, patent innovations that deserve patents? Your Honor, again, a technological solution to a business problem could well be, whether it's a method or a process, is equivalent. Again, Congress said method and course are not equivalent. Can you give me an example? I thought my data compression example was a good one. I'll try an encryption technology. Many of these trading platforms, you know, dealing with securities and money would require some sort of security devices. You could have a process for securely transmitting data would be another computer implemented technological solution to a business problem. Again, nothing like that claimed here. But how about e-mail and just word processing programs? Your Honor, a program — let me try it this way to both of your questions. In our view, if what is claimed as the inventive contribution under Mayo — in other words, if we have an abstract idea, as we do here, and what is claimed as the inventive contribution for Step 2 is the computer, then the computer must be essential to that operation and represent an advancement in computer science or other technology. And we know that's not met here, Justice Sotomayor, because — Your Honor, I think at a point — They certainly have functionality — an improvement of functionality for the user. At a point in time in the past, I think both of those would have been technological advances that were patentable. How? Today, because they would have provided a technological solution to a then unmet problem. Today, reciting and do it on a word processor is no different than and do it on a typewriter or and do it on a calculator. The inventive contribution component, which uses specifically the language of conventional and routine and well understood, will evolve with technology. That's why it's different than the abstract idea component. And here we know that these patents don't claim anything that was not conventional, well understood and routine. We went through that in great detail, and Alice has never disputed a word of it. They just say you're not supposed to do that analysis, even though the Court, 9-0 and Mayo, said we should. And in this case, it's very important to look at what Alice's own expert said on this subject. This is not our expert. This is Alice's expert. And this is at page 132728 of the Joint Appendix. It is possible to do the business methods of maintaining accounts, adjusting accounts, and providing an instruction without a computer or other hardware. And then, Justice Breyer, directly to your abacus. If someone had thought of this invention, so-called invention, 100 years ago, they might have implemented it in a non-electronic manner using various precomputing tools such as an abacus or handwritten ledgers. We know from Benson, the Court's seminal computer implementation case, that if you can do it by head and hand, then the computer doesn't add anything inventive within the meaning of the 101 exception. That is the holding of Benson. And the Court reiterated that in Mayo. Fluke said exactly the same thing. If you can do it with pencil and paper, then the computer is not offering anything that the patent laws are or should be concerned with. It is only where the method will not work without a computer, which is not these claims, and where the computer itself is doing something that the patent law is willing to protect. Roberts. What if you can't do it without a computer, but it's going to take, you know, 20 people 100 years? In other words, theoretically, you can replicate what the computer does. It's impractical without looking to do it on the computer. Mr. Chief Justice, first, these claims literally read, as Alice reads them, on a single transaction between two parties. So it's not 20 people for 100 years. It's one person sitting in a room. So that's not a problem. Second, if what is being claimed is the necessary speed or efficiency or data crunching capabilities, if you will, of a computer, then it would have to be claimed. And there's nothing claimed here. All that is claimed, and my friend is going to stand up on rebuttal and tell you all that the expert said, well, what is claimed is a computer, but it's just a computer. It just says a computer configured to. It doesn't say that the computer actually has to do anything. Breyer, but the trouble with that particular test is, as I think partly the Chief Justice said, how long, et cetera, and then add to that, though you could do it without a computer, what happens at the end of the line is the automobile engine goes off or it begins to sputter or it turns left. You see, it's possible to take Archimedes or, you know, I use that example purposely to call attention to the problem. You can take those things and you're not just saying apply it. And you're not even just saying you are saying use the computer, but at the end of the road, something physical in the world changes and everybody would say, now that's — that falls within, I mean, probably — I mean, my hesitation shows I'm looking for the right words. Justice Breyer, I think your point is the reason that it is equally fallacious to suggest on the one hand, as Alice and IBM does, that simply reciting a computer is a magic key that gets you through 101 and you never have to do any other inquiry, and what some of the folks on the — on the other side say, which is that computers or software are never eligible. Both of those things have to be wrong, because what the Court said in Bilski was future innovation is too uncertain. We are not going to do that as a court. And the Court laid out an approach using abstract ideas in Bilski, an event of contribution in Mayo, that is flexible enough to take into account that innovation and to deal with particular claims in context, which is why at the end of the day we have to come back to these patents and decide which— Kagan. Mr. Perry, before we get back to these matters, just — you said to Justice Scalia, if a patent sufficiently describes how a computer will implement an idea, then it's patentable. So how sufficiently does one have to describe it? What do we want a judge to do at this threshold level in terms of trying to figure out whether the description is sufficient to get you past it? If I can answer in two steps, Justice Kagan. First in the negative, what the applicant or patentee must do — must not do is simply describe the desired result. That would take us back to State Street. That would simply say, I claim a magic box that buys high and sells low, or vice versa, I suppose. I may claim a magic box for investing. That's what these patents do. And then to put it in the affirmative and in the language of Mayo, the claim has to be something significantly more. Something significantly more than the abstract idea itself. That will be a contextual analysis based on the claims and specifications and file history, and we know that some devices, some methods, some programming will pass that. It is not going to be a bright-line rule, and that's one of the tug-of-war issues that this Court and the Federal Circuit have been having in these cases. The Federal Circuit wants bright-line rules. All computers are in or all computers are out. This Court has been more contextual. This Court has been more nuanced. This Court has looked at things in a more robust way. You're not suggesting that specific code is necessary? No, Your Honor. I think the actual description of the programming is a 112 problem. I agree with that, a 112 issue. That is the realm of the written description requirement. What is a 101 problem is, it is on the applicant to do more than simply describe the result, simply say a magic box that does intermediated settlement. And we can tie that back to this particular prosecution, the 510 patent, which is the method patent. The examiner rejected it. Under section 101, the examiner said this is an abstract idea. You can't have this patent. And the only change that this applicant made was to add in the adjusting step electronic adjustment. It put in one word, electronic adjustment. And under State Street, which is what this patent was prosecuted under, that was enough, because the result of adjusting run through a computer is enough. Under current law, that can't be enough. That just can't get a patent over the line, because this Court said in Mayo, and I've got to quote this language, simply implementing a fundamental principle on a physical machine, namely a computer, is not a patentable application of that principle. That's all that Alice has done. These are pre-Bilski patents. They never should have been issued. General Verrilli will stand up and address that point. And certainly under current law, they are. One point on the AIA. Congress did not send all this to the administrative process. Congress created two avenues, the courts and the PTO, to use the standards. Essentially, it ratified Bilski and Mayo and said, we agree with what you all are doing at the Supreme Court, and the existing standards are good enough for us, this is a judicial problem. And that is a good reason. Ginsburg. The Federal Circuit in this case split in many ways, and it had our decisions to deal with. And you said, given Bilski and Mayo, this is an easy case. What is the instruction that escaped a good number of judges on the Federal Circuit? How would you state the rule? Your Honor, I think there is a significant element of the Federal Circuit that disagrees with Mayo and has been resistant in applying it. Chief Judge — former Chief Judge Michel filed a brief in this Court essentially saying Mayo is a life sciences case, you should limit it to that, because if you apply it to everything else, then these patents are no good. Mayo, we submit, is a technology-neutral, industry-neutral, exception-neutral framework that can be used to answer all of these questions. This is not the death of software patents. The software industry is all before this Court saying, this is fine with us. I mean, every company in the United States practically, except for IBM, is saying, go ahead. This will not affect software patents. Justice Ginsburg, this Court's precedents are clear. They are unanimous. They just need to be applied. To suggest that there is confusion that needs to be addressed by retreating, beating a retreat from recent unanimous decisions, would simply reward intransigence, difficulty, refusal to adhere to what are clear precedents, because unbeknownst to those of their peers— Kagan —shouldn't we be concerned, Mr. Perry, that there are old patents that, in fact, could meet the test that you set forth, but won't because they were written in a different time and so used much more general language? Chief Judge Michel —Your Honor, the applicant or the patent holder would have the opportunity to institute a reexamination proceeding or some sort of administrative process to address that issue. And second, it should be noted, this is a very small problem. There are 2 million outstanding patents in the United States. In the last four fiscal years, there were 22,000 infringement litigations instituted. But since Bilski, there have only been 57 district court decisions on Section 101 issues. There have only been 12 Federal Circuit decisions total on computer implementation. We are talking about a group of patents, Justice Kagan, that's way out at the tail end of the distribution. Most patents never have a one-on-one challenge. This is not an issue with cotton gins and other things. This is a problem for the most marginal, most dubious, most skeptical patents. The ones that this Court in Bilski — and remember what Bilski's holding is. The majority said they are processes, but it did not say they are eligible. Thank you, Mr. Chief Judge. Thank you, counsel. General Verrilli. Mr. Chief Justice, and may it please the Court, an abstract idea does not become patent eligible merely by tacking on an instruction to use a computer to carry it out. Computer makes a difference under Section 101 when it imposes a meaningful limit on the patent claim. That occurs when the claim is directed at improvement in computing technology or an innovation that uses computing technology to improve other technological functions. That's the test that we believe is most faithful to this Court's precedents in Bilski and Mayo. It keeps the patents within their traditional and appropriate domain, and it is capable of being administered consistently by courts and by PTO examiners. How do you answer the argument that your view would extinguish business method patents and make all software ineligible for patent protection? Yeah. Let me address software patents first, because that, I think, is obviously a significant question. And it's just not correct to say that our approach would make software patenting ineligible. Any software patent that improves the functioning of the computer technology is eligible. Any software patent that improves the — that is used to improve another technology is eligible. For example, the patent in the Deere case is one in three. Why do we need to reach this in that — reach software patents at all in this case? Well, it's the necessity for us to announce a general rule with respect to software. There is no software being patented in this case. Well, I think while they've — there's a process being — and one can think of software patents as process patents, and I think that's why my friends on the other side are saying the sky is falling, because they are interpreting what we're saying about when a computer makes — when a computer's involvement makes something eligible under 101, it's calling those into question, and it doesn't — Do you think we have to reach the patentability of software to answer this case? Well, I think you can — I think the answer to that question is no, not necessarily. You can decide it by saying that Bilski answers the question of whether this is an abstract idea, because this form of hedging is really no different than the form of hedging as a conceptual matter at issue in Bilski, and then Mayo answers the question of whether the use of a computer in this case adds enough to the abstract idea beyond conventional steps, because here all we have, after all, is just conventional use of computing technology, no computer innovation, such that you don't qualify under 101. You could take that approach. But it is important to the United States that we — and to our patent examiners that we get some clarity if we can, and I think the clarity could come from the test that I've proposed, which I want to reiterate. Could you go on with that, because you were just getting to the point where I think you'd say the computer improvement that in fact leads to an improvement in harvesting cotton is an improvement through a computer of technology, so it qualifies. But then I think you were going to say, or I got this also from the brief, a computer improvement that leads to an improvement in the methods of selling bonds over the telephone is not an improvement in technology reached by the computer. Am I right about the distinction you're making? I don't think there's a yes or no answer to that question. What is your view? Yeah. What is — how do we deal with just that? If there is a genuine innovation in the functioning of the computer, such that business process — We've got that. Yeah, yeah. We've got the computer. But then it doesn't improve the computer, but rather it improves through the computer the harvesting of cotton. Now, you've got it in what you said was your second category, which is an improvement through the computer of a technology. And I thought in your brief you were distinguishing an improvement through the computer of a human activity that is not a technology, and in particular to pick an example of that, something in finance or something in business. Now, am I right about the distinction you are making? If I'm not right, what is the distinction? That is generally the line we're drawing. And how is that justified? That is Judge Dyke in — in Bilski in the Federal Circuit. Four people sort of picked it up, maybe. Five didn't pick it up. Would you say a few words about it? Sure. About — let me go to Bilski there. And I do think, while certainly the Court held that the term process got a natural construction, which could include business methods, it seems to me that that's not all the Court said in Bilski. The Court also said that it was historically and traditionally quite rare that business methods were patent eligible. It also said that — that courts and the PTO examiners should use the abstract ideas exception to 101 to police the appropriate boundary. It also said that the machine or transformation test that the United States advocated remained a useful tool. And, of course, that directs you to seeing whether there is a technology application. And, of course, the holding in Bilski was that the — the method for hedging risk was ineligible because it was an abstract idea. And I can't imagine that if in Bilski the claim had been exactly the same, but it added use a computer to carry out some of these standard random analysis functions that are claimed by the patent, that you would have found it to be patent eligible. And I would submit to the Court that the key point here, I think, is that now, given where the Court — what the Court has held in Bilski, given what it's held in Mayo, the abstract ideas exception is really the only tool left to deal with what I — what I think I fairly read Bilski as saying is a significant problem, the proliferation of patents of business methods. Kennedy. Is there an example that you can give us of what we can call a business process that is patentable, a process that doesn't involve improving the workings of a computer? I think it's going to be difficult for me to do that. I think, for example, if you had a business method, a process for additional security point-of-sale credit card transactions using particular encryption technology, that might well be patent eligible. It's a technology that makes conduct of business more efficient or effective. But there is a technological link here, and we do think that's critical to our point of view with respect to the case. And I — and I do think, remember, that when we say something's not patent eligible, we're not saying they can't do it. We're saying they can't monopolize it. And the concern in a situation like this one is that if this is patent eligible, it's hard to see why, for example, the first person who came up with a frequent flyer program wouldn't have been able to claim a patent there, because after all, that's a business method for improving customer loyalty implemented on a computer. General, I — you mentioned a while ago the need for greater clarity and certainty in this area. And I'm just wondering — in your brief, you've got a non-exhaustive list of factors to consider, and there are six different ones. And I'm just doubtful that that's going to bring about greater clarity and certainty. I take — I take the point, Mr. Chief Justice, but I think the key is that they are all directed to answering the question of whether the innovation that is claimed is an innovation in either, A, the improvement of a computer's functioning, or, B, the use of computer technology to improve the functioning of another technological process, in a case like Dyer would be in the latter category. And so I do think that that's the key benchmark, that's the baseline, that's the test that we do think can be applied clearly and consistently by the courts and by the PTO. And it avoids the risk of things like frequent flyer programs or the Oakland A's Moneyball methods for evaluating the contributions that individual baseball players make, or any one of a host of other things that our intuitions tell us just don't belong in the patent system. That's the — drawing that line keeps them out. Not drawing that line lets them in. And with all due respect, I don't think that the novelty and non-obviousness filters at 102 and 103 really deal with that problem effectively. Because when you get to non-obviousness in 103, for example, you'll be asking a different question. If you take the frequent flyer program, you would say, well, is this innovation in building consumer loyalty something that would have been obvious to somebody who runs an airline? It's totally divorced from the question of technology at that point. And therefore, I don't think you're going to get the screen that you need to get in order for the patent system to be confined to its traditional and appropriate scope. If there are no further questions, thank you. Ginsburg. I have a question about how do you identify an abstract concept? The natural phenomenon, a mathematical formula, those are easy to identify, but there has been some confusion on what qualifies as an abstract concept. We would define an abstract concept as a claim that is not directed to a concrete innovation in technology, science, or the industrial arts. So it's abstract in the sense that it is not a concrete innovation in the traditional realm of patent law. Thank you. Thank you, General. Mr. Phillips, you have four minutes remaining. Thank you, Mr. Chief Justice. I'd just like to make a few points. First of all, with respect to the question you asked, which is looking at 159, etc., all I can tell you is that if you look at Claim 33, it talks about matched orders. Matched orders are then described in 286 and 287, and then it's a big specific reference to 159 and that flowchart that's there. And it's all designed as a package. It's only one element of the invention, but it is a central element, and it's an easy one to understand, and it goes well beyond simply the notion of hedge against settlement risk and do it by a computer. Your adversary says that his — the appendix to his brief are the only patents at issue, that the flowcharts are not at issue in this case. There's no basis for that statement, Your Honor. Remember, this went off on a very truncated litigation process, so there's — we got cut off at the beginning of it. There's been no construction of the claims, and obviously these are specifications that go to how you interpret the claims. If we were to say that there are no business patents, would your patents survive at all? No, I don't believe so. I think there's no question. And, you know, General Verrilli could not have been any plainer in his statement of how he wants to interpret the abstract idea concept. And he wants to say no business. No business methods. It's just another way of saying no business methods. And that — and, you know, the Court rejected that, and it seems to me extraordinary to say Congress didn't reject no business methods in 101, but we're going to do — we're going to manipulate the judicial exception to accomplish precisely that same thing. It seems to me that's wholly inappropriate. Justice Ginsburg, you asked my friend here, you know, what's his test. He didn't answer that question, you'll notice, because he doesn't have an answer. His basic argument is whatever you do, just kill this patent. And if I were in his shoes, I suppose I'd take that same position. I think what's absolutely clear is that the test ought to be one that is structured as a very coarse filter, not the kind of filter that he's pushing for, where it changes over time. I mean, I thought his — I thought his response to one of the questions about e-mail and word processing that Justice Sotomayor asked is over time it would change. Well, that's exactly what 102 and 103 are for. That is not the purpose of the — of section 101. And then he uses the example of encryption. I guarantee you if we were arguing about encryption in this case, he would say to me that that's an abstract principle because encryption is a concept that's been around since time immemorial. George Washington used it. Everybody has used encryption. And the question, again, that's not the solution to these problems. The question is how did we go about doing it, and we go beyond the basics of simply saying use a computer, and that's what we ask this Court to focus on and to evaluate. As to the frequent flyer program, it's pretty clear to me that even though it was a novel idea in some sense, the concept itself would have been viewed in the KSR fashion as quite obvious as a means of improving customer loyalty. There are solutions here. Giving us 101 pass doesn't create a monopoly. It just gets us to the 102 and 103 inquiries that are at the heart of what the patent laws — and 112 — that are at the heart of what the patent laws ought to be dealing with. If there are no further questions, Your Honor, thank you. Thank you, counsel. The case is submitted.